GAIL SHIFMAN
Law Office of Gail Shifman
2431 Fillmore Street
San Francisco, CA 94115-1814
Tel:    415-551-1500
Email: gail@shifmangroup.com

Attorney for Defendant
JOWUAN JONES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    *v.*<br><br>JOWUAN JONES,<br><br>            Defendant. | CASE NO. CR 25-00402 JST<br><br>DEFENDANT JOWUAN JONES'<br>MOTION TO REVOKE DETENTION<br>ORDER<br><br>DATE: April 24, 2026<br>TIME: 9:30 a.m..<br>JUDGE: The Honorable Jon S. Tigar |

PLEASE TAKE NOTICE that, on April 24, 2026 at 9:30 a.m., or as soon thereafter as the matter may be heard before the above-entitled Court, defendant JOWUAN JONES, by and through his attorney, will and hereby does move the Court to release him from custody to reside in residential drug treatment at New Bridge Foundation, once he is deemed accepted, and as recommended by Pretrial Services.  Mr. Jones' family members have also agreed to sign an unsecured bond in conjunction with Mr. Jones' release to New Bridge.

MOTION TO REVOKE DETENTION ORDER

## INTRODUCTION

### I.    Procedural History

Mr. Jones is charged in an Indictment with one count of Conspiracy to Distribute and Possess with Intent to Distribute Over 100 Marijuana Plants, in violation of 21 U.S.C, §§ 846, 841(a)(1), (b)(1)(B) and one count of Attempted Possession with intent to Distribute Over 100 Marijuana Plants, in violation of 21 U.S.C, § 841(a)(1), (b)(1)(B) occurring in December 2023.  He made his initial appearance before the Court on December 11, 2025, and an initial detention hearing was held on December 15, 2025, with Mr. Jones detained.  Dkt. 88. On March 19, 2026, Mr. Jones moved to reopen the detention hearing, which was heard on April 2, 2026, resulting in Mr. Jones' continued detention. Dkt. 147.  Transcripts of these hearings are available at Dkts. 94, Exhibit A, and 149, Exhibit B.

## ARGUMENT

### I.    Legal Standard and Burden of Proof

Under the Bail Reform Act, 18 U.S.C. § 3142 et seq., a magistrate judge's detention order may be reviewed by "the court having original jurisdiction over the offense." 18 U.S.C. § 3145(b).  This Court reviews the magistrate judge's detention order de novo. *United States v. Howard*, 793 F.3d 113 (9th Cir. 2015) (review of district court's revocation of a pretrial release order); *United States v. Koenig,* 912 F.2d 1190, 1191 (9th Cir. 1990).  As such, the Court is to "review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *Koenig,* 912 F.2d at 1193. "If the performance of that function makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so, and its power to do so is not limited to occasions when evidence is offered that was not presented to the magistrate." *Id.* (citation omitted).

The Bail Reform Act requires the release of a person pending trial unless the Court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required

MOTION TO REOPEN DETENTION HEARING

and the safety of any other person and the community . . . ." 18 U.S.C. § 3142(e)(1); *see United States v. Motamedi,* 767 F.2d 1403, 1405 (9th Cir. 1985). Thus, the statutory presumption is first in favor of release on personal recognizance or on "an unsecured appearance bond in an amount specified by the court." 18 U.S.C. § 3142(b); *see also United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). If the Court has concerns regarding "the appearance of the person as required and the safety of any other person and the community," the Bail Act directs the Court to determine the "least restrictive" combination of conditions that will address those concerns. 18 U.S.C. § 3142(c)(1)(B). "Only in rare circumstances should release be denied." *Motamedi,* 767 F.2d at 1405.

The Bail Reform Act favors pretrial release; "the court must resolve all doubts regarding the propriety of release in the defendant's factor." *United States v. Sanchez-Martinez,* 2013 WL 3662871 (D.Col. 2013); *United States v. Dany, 2013 WL 4119425* (N.D. Cal. 2013). (pretrial release should be denied "only in rare circumstances").  The threat of flight must be **serious**. *United States. v. Wasendorf,* 2012 WL 4052834 (N.D. Iowa 2012)(fact that defendant's assets have been frozen etc. eliminates serious flight risk; fact that defendant attempted suicide does not create fight risk); *United States. v. Jamal*, 285 F.Supp.2d 1221 (D. Ariz. 2003); *see United States v. Giordana*, 370 F.Supp.2d 1256 (S.D.Fla. 2005)(serious charges not enough by themselves to justify detain on basis of flight risk – court lists factors justifying finding of flight risk).

Where, as here, a defendant is charged with violating a controlled substance offense, a rebuttable presumption arises under 18 U.S.C. § 3142(e)(3).  If the defense successfully rebuts that presumption, the burden then shifts to the Government to show by "clear and convincing evidence, that the Defendant is a danger to any other person or the community." *Hir*, 517 F.3d at 1086.  The clear and convincing standard requires the government to prove that Mr. Jones actually poses a danger.  It is not sufficient to theorize that he *could possibly* pose a danger. *United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991), *United States v. Marquez*, 2018 WL

MOTION TO REOPEN DETENTION HEARING

4773152 (N.D. Cal. 2018).

The presumption that arises in a drug offense was arguably intended to prevent flight. See, United States v. Jessup, 757 F.2d 378, 395-398 (1st Cir. 1985) (remarks from hearings on Bail Reform Act). Here, the government's basis for detention and the Magistrate's findings were not based on risk of flight but were instead based on alleged danger to the community.

The factors the Court must consider in making its determination under the Bail Reform Act are set forth in § 3142(g) and include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including their character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug and alcohol abuse; and (4) the nature and seriousness of danger to any person or the community that would be posed by the person's release. See 18 U.S.C. § 3142(g). Of these, the "weight of the evidence" in support of the charge against the defendant "is the least important of the various factors." Motamedi, 767 F.2d at 1408. Moreover, "[a]lthough the statute permits the court to consider the nature of the offense and the evidence of guilt, the statute neither requires nor permits a pretrial determination that the person is guilty." Id. (citation omitted).

Prior arrests, not resulting in convictions are an insufficient ground to base a danger to the community finding. United States v. Leyba, 104 F.Supp.2nd, 1182, 1184 n.2 (S.D. Iowa 2000). Juvenile adjudications are not "prior convictions" and should not be considered as such. United States v. Silva, 133 F.Supp.2d 104 (D.Mass. 2001).

There is not clear and convincing evidence that Mr. Jones is a danger to the community and his release to a drug treatment program is warranted.

////

////

MOTION TO REOPEN DETENTION HEARING

**II.     Ordering Mr. Jones Release to Residential Treatment Can Effectively Protect the Public and Ensure Mr. Jones' Appearance, While Providing Him the Treatment He Needs**

Given Mr. Jones' lack of resources or ties to any area outside of the Bay Area, there is little concern that he presents a risk of flight. The central issue for the Court is whether any danger Mr. Jones presents to the community can be mitigated by conditions of release.

A.   Nature and Circumstances of the Offense Charged

Mr. Jones stands accused of participating in a conspiracy to possess with intent to distribute marijuana plants where his role is described as attempting to possess marijuana plants.  Details surrounding the alleged offense are charged with emotion and a tragic outcome that resulted from another's actions which Mr. Jones was not involved in.  On the night of the charges, others allegedly twice burglarized an illegal marijuana grow operation.  Mr. Jones is not alleged to have participated in those burglaries.  In fact, it is not known what if any evidence links him to any conspiracy involving any marijuana plants that may have been taken during those two burglaries. It is alleged that Mr. Jones was then later contacted and that he subsequently arrived to participate in the taking of marijuana plants from the illegal grow.  That attempt at obtaining marijuana plants was interrupted by the arrival of a van with everyone scattering and leaving the grow site. The van followed one of the cars that departed, a car that Mr. Jones did not arrive in or depart in, and one of the people in that car fired at the following van striking one of the passengers and killing him.  That person was an Oakland police officer in plain clothes that night.  He is not alleged to have participated in that shooting and is not charged with that crime.

B.   History and Characteristics of the Person

Much has been made by the government regarding the past criminal history of Mr. Jones.  He has one juvenile adjudication for possession of drugs and two prior convictions for burglary and two convictions for evading the police. While there is no question that he has prior convictions, none of

MOTION TO REOPEN DETENTION HEARING

these convictions are crimes of violence.  Nor is there any indication that Mr. Jones ever received the benefit of drug treatment during his involvement in the criminal justice system which would have provided him with the tools to address the root causes of his offenses.  Further incarceration will only further compound his poverty while drug rehabilitation will provide opportunities to reside in sober living environments as well as participating in job training programs.

C.  The nature and seriousness of danger to any person or the community

Mr. Jones is not asking to be released on his own recognizance.  He knows that he needs the structure and discipline of a program like New Bridge to start him on a new path.  If released to New Bridge, Mr. Jones will be housed there and subject to the program's strict rules.  If he were to falter in the program, he knows the Court is watching.

The government has argued that Mr. Jones was a participant in commercial burglaries that occurred on September 17, 2025, two years after the charged offense. Their argument is based on a single summary sentence in a form probable cause declaration that stated that Target Phone #1, IMSI ending in 9590, IMEI ending in 6037 with telephone number (341) ***-8178 was located at 6 of the 8 locations. The probable cause declaration then summarily concluded that Mr. Jones was the owner of the Target Phone #1 phone at the locations of the September 17, 2025, burglaries. The probable cause declaration does not provide a factual basis for this conclusion. The government does not possess any additional discovery or evidence, such as subscriber information or call detail records to support this conclusory statement.  Though this conclusory statement is contained in a document entitled Probable Cause Declaration, there is not even probable cause to support the conclusory statement.

During the initial detention hearing the government repeatedly falsely argued that the September 17, 2025 burglaries were *armed* burglaries which served as their predicate to argue

MOTION TO REOPEN DETENTION HEARING

that Mr. Jones showed "a willingness to continue to engage in such reckless behavior since those events, even knowing that there could be a potential fatal outcome." Dkt. 94, 7:1-3.  In detaining Mr. Jones, the Court stated that "the fact of his armed burglary led to the murder of a police officer was apparently not sufficient to cause the Defendant- - or to stop the Defendant from committing more burglaries, which indicates an unacceptable indifference to human life."  Dkt 94, 13-14:23-25, 1-2. Clearly the Magistrate Judge was influenced and swayed by the government's repeated references to the alleged *armed* burglaries that occurred on September 17, 2025 and Mr. Jones' alleged involvement in those burglaries.

In fact, though, the September 2025 burglaries were clearly *unarmed* burglaries. The government may now claim in Monday morning quarterbacking that they misspoke during the detention hearing and the Magistrate may aid them in their effort by giving them that out as he did during the April 2, 2026 detention hearing but the thrust of their argument has been that Mr. Jones was an armed burglary participant in 2023 and though someone was killed following that burglary that didn't stop Mr. Jones from putting others' lives in jeopardy by being an armed burglary participant again in 2025.  And given the Magistrate's statements on the record during the December 15, 2025 detention hearing, the Court clearly adopted the government's arguments as evidenced by the original detention order at Dkt. 88.

At the April 2, 2026 detention hearing, the Magistrate stated otherwise but the record itself is clear.  As a practical matter, Mr. Jones himself has never been charged in a crime of violence. He himself has never been alleged to have committed acts that are crimes of violence. There is evidence favoring release-Mr. Jones' ties to the community-rebuts any detention presumption. The government has not shown by clear and convincing evidence that Mr. Jones poses "an identified and articulable threat" to the community.  Considering the factors in 3142(g), there are release

MOTION TO REOPEN DETENTION HEARING

conditions that ensure that Mr. Jones does not pose a threat to the community  and Mr. Jones urges the Court to impose the conditions of release as articulated by Pretrial Services.

DATE: April 10, 2026                          Respectfully submitted,


                                              _____/s/ Gail Shifman_____
                                              GAIL SHIFMAN
                                              Attorney for Defendant
                                              JOWAUN JONES

MOTION TO REOPEN DETENTION HEARING

EXHIBIT A

MOTION TO REOPEN DETENTION HEARING

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan van Keulen, Magistrate Judge

UNITED STATES OF AMERICA,            )
                                     )
          Plaintiff,                 )
                                     )
vs.                                  )    No. CR 25-00402-5-JST
                                     )
JOWAUN JONES, et al.,                )
                                     )
          Defendants.                )
_____)

                              San Jose, California
                              Monday, December 15, 2025

  TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 11:39 - 11:58 = 19 MINUTES

APPEARANCES:

For Plaintiff:
                              United States Attorney's
                                Office
                              United States Department of
                                Justice
                              1301 Clay Street, Suite 340S
                              Oakland, California 94612
                         BY:  KELLY I. VOLKAR, ESQ.

For Defendant:
                              Law Office of Gail Shifman
                              2431 Filmore Street
                              San Francisco, California
                                94115
                         BY:  GAIL R. SHIFMAN, ESQ.

Transcribed by:               Echo Reporting, Inc.
                              Contracted Court Reporter/
                              Transcriber
                              echoreporting@yahoo.com

2

Monday, December 15, 2025                                11:39 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Now calling Criminal Matter 25-402-JST-5, United States versus Jowaun Jones.

Counsel, starting with the Government, please state your appearance for the record.

MS. VOLKAR:  Good morning, your Honor.  Kelly Volkar on behalf of the United States.

THE COURT:  Good morning.

MS. SHIFMAN:  Good morning, your Honor.  Gail Shifman on behalf of Mr. Jones, who's present in custody, and I'm handing up the financial affidavit.

THE COURT:  Good morning.

OFFICER PORTILLO:  And good morning.  Jessica Portillo with U.S. Pretrial Services.

THE COURT:  Good morning.

(Pause.)

THE COURT:  I've reviewed the Defendant's financial affidavit.  I find that he qualifies for appointed counsel.  And, Ms. Shifman, I confirmed your continued appointment to represent the Defendant.

MS. SHIFMAN:  Thank you, your Honor.

THE COURT:  We are here on a detention hearing. The bail report recommended release if a viable resource

3

comes forward.  Subsequently, Pretrial interviewed two bail resources, the Defendant's girlfriend and mother.

Were the parties provided, I assume by email form, the results of that interview?

MS. SHIFMAN:  Yes, your Honor.  Those two interviews were actually in the Pretrial Services Report, and then this morning there was a follow-up email I saw, Government counsel to your Honor, which got forwarded to myself and Government counsel.

THE COURT:  So, I'm referring to Jayda Wegland (phonetic) and Andrea Ryan (phonetic).

MS. SHIFMAN:  I'm sorry.  I didn't hear the last name.

THE COURT:  Andrea Ryan.

MS. SHIFMAN:  Yes, your Honor.

THE COURT:  Okay.  And does the Government have the results of those interviews as well?

MS. VOLKAR:  Not with me today, your Honor, but I'm prepared to proceed.

THE COURT:  But, I mean, at some point did you get that from Pretrial?

MS. VOLKAR:  It sounds like I was copied on the email.  I did not see it, but I -- that's --

MS. SHIFMAN:  It's also in the Pretrial Services Report.  There's comments on page one and two regarding Ms.

4

Wegland and Ms. Ryan.

THE COURT:  Oh, I see.  I -- I think the new development is that they would be available resources?

MS. SHIFMAN:  Correct.  That was the email today.

THE COURT:  Okay.  And the Government was copied on that?

MS. SHIFMAN:  Yes, your Honor.

THE COURT:  All right.  Thank you.

Then let me turn to the Government.  Please proceed.

MS. VOLKAR:  Thank you, your Honor.

As your Honor is now familiar, the indictment -- the charges that the Defendant faces here are very serious. They stem from a very dangerous and -- and reckless series of burglaries of an unoccupied marijuana grow house, at which point Mr. Jones was called around 4 o'clock in the morning in order to join a burglary of a place that had already been burglarized multiple times.  An argument can be made that with each successive burglary, particularly on the same night, that there may be interference that the local police may be alerted to their presence or the grow house owner.  So, with each successive armed burglary, it increased in danger.

Nevertheless, Mr. Jones is one of the individuals, several of whom were talked about today who answered the call very quickly, at 4 in the morning, arrived with masks

5

and gloves and was ready to engage in another armed burglary of this marijuana grow facility. And, despite knowing that their dangerous and reckless behavior that particular night did, indeed, culminate in the form of a fatal shooting of an OPD officer, Mr. Jones continued to commit similar dangerous crimes after that night.

Mr. Jones is not one of the Defendants -- there are some before your Honor -- but is not one of the Defendants that was brought on state charges related to the events of that night. However, Mr. Jones notes that he participated. Cell phone detail records show that Mr. Jones was there that night. And, despite that, in September of this year, Mr. Jones participated in eight successive armed burglaries in Union City, and six out of eight of those burglaries local police officers have identified his call detail records as putting him there.

We have a probable cause declaration from that incident in September of this year that we provided Defense --

THE COURT: I have a question about that. On page seven of your memorandum, you identify the Union City burglaries as being in September. On page 13, you say October. Is it September?

MS. VOLKAR: Yes, your Honor.

THE COURT: All right. Thank you.

MS. VOLKAR: And we do have a copy of the probable

6

cause termination from the County of Alameda that we could pass up to, your Honor.  We have already provided a copy to Defense, if it would be helpful.

THE COURT:  You have that, is that correct?

MS. SHIFMAN:  Your Honor, yesterday, I -- I was not in my office on Saturday.  So, yesterday I saw that discovery had been produced.  I have not gotten through all that discovery yet.

THE COURT:  You don't want to be put on the spot by something they're just handing you at the hearing?

MS. SHIFMAN:  That's correct, your Honor.

THE COURT:  All right.  Then please proceed, Counsel.

MS. VOLKAR:  Thank you, your Honor.

So, again, it's a pretty thorough eight-page detailed probable cause determination that puts Mr. Jones -- that connects Mr. Jones to a similar set of armed burglaries. And, again, what's concerning to the Government here is the pattern, your Honor, and the question before the Court is whether or not there is a set of conditions that can remove the danger that Mr. Jones presents to the -- to the community.  And we would argue that given the pattern -- and that's -- also, I will go briefly into his prior criminal history.  But, again, what most concerns the Government is Mr. Jones' behavior in this particular case and the fact

7

that he has shown a willingness to continue to engage in such reckless behavior since those events, even knowing that there could be a potential fatal outcome.  But that is also in culmination with Mr. Jones' prior criminal history in which he had 19 arrests, including for assault with a deadly weapon, other firearms charges.  He's been convicted twice previously for burglary, twice for evading peace officers, and once for the possession with intent to sell narcotics.

So, in addition to sentences in County Jail, he has served time in State Prison.  So, Mr. Jones, in totality, does not, we believe, present to the Court someone who can be released to the community without presenting a further danger.

THE COURT:  Thank you, Counsel.

Let me hear from the Defense.

MS. SHIFMAN:  Thank you, your Honor.

Your Honor, I would note that present in the courtroom is Ms. Jayda Wegland, who is the mother of Mr. Jones' child. She -- if she would just raise her hand.  She is here with their 10-month-old daughter.

Additionally, his Aunt Letia (phonetic) -- I apologize if I'm saying that incorrectly -- Jones is here.  She could also serve as a -- an additional surety if the Court feels that is necessary.

Ms. -- Ms. Wegland is employed at Crumble Bakery.  She

8

works full time. They've been together as a couple for close to three years. They do -- he occasionally has stayed, of course, with his significant other, but they don't reside together. She lives with her family in Oakland at the address that's in your Honor's email this morning. She is willing to sign onto the bond.

Ms. Jones herself, she is a lifelong resident of Oakland. She's employed full time. She has no criminal history either. She works in security, and she is licensed through the California Bureau of Security -- CBSIS. I apologize but I don't remember what the last two initials stand for, but it's a -- a licensed California state agency. If the Court feels it's necessary, she is available to sign on as well.

We agree with the Pretrial Services' recommendation. We think that Mr. Jones himself should go to residential drug treatment at New Bridge. We agree that the interview should happen while he's in custody. We have no objection to that. We believe that the amount of the bond is appropriate as recommended by Pretrial Services.

He does live on Courtland Avenue at the address that's in the Pretrial Services Report. That's 3229 Courtland Avenue in Oakland. That is his uncle's address. He's lived there for the last two years. Right next door is his grandmother who's also listed in the Pretrial Services

9

Report.  I have verified that he lives at that Courtland address and has lived there for approximately two years.

THE COURT:  His mother indicated that he'd been transient for two years.

MS. SHIFMAN:  I think what she means -- meant by that is that he doesn't have his own apartment or house.  He does -- because he does stay sometimes with Jayda, his significant other, but his residence is with his uncle, and sometimes he does spend the night next door at his grandmother's as well.  So, I think that's what she meant by transient is because he's not directly on a lease, your Honor.

In addition, I have verified that he works at Shorty's.  That's something he wouldn't return to until completion of an inpatient drug treatment program.  I've confirmed that once he's released, that is available to him.

With regard to the nature of the charges here, you know, I've been present today.  I was present when we first appeared last week.  I understand that there are some Defendants who are charged in this case who are charged in State Court with more serious offenses.  Those individuals were involved in the first two robberies.  Mr. Jones was not.

I understand he's charged in a conspiracy that includes two other robberies, but what I haven't heard is any

10

information or seen any information that he knew anything about those additional robberies.  The allegations here is that he showed up for an attempted robbery, which apparently was the third robbery at that location that night.

With regard to the pattern that the Government alleges, what we've been told here today is that there are call records that show he was near some location of robberies. That's the quality of the evidence that's been presented to the Court.

I believe that the conditions that Pretrial Services has recommended, along with Ms. Wegland and if the Court would like, Ms. Letia Jones, signing onto the bond are appropriate, plus the interview and residential drug treatment by New Bridge, if the Court is inclined to do that, I would ask that at least the -- at least have the bond signed today because they are here today.  And, of course, we'd hold that pending any additional hearing, come back after New Bridge has the opportunity to interview Mr. Jones and indicate whether he is acceptable or not and whether or not there's bed space.

THE COURT:  All right.  Thank you.

Would the Government like to respond?

MS. VOLKAR:  Yes, your Honor.  Particularly, I did see the email shortly before court today, your Honor.  I had a chance to quickly review it.  I apologize for not seeing

11

it before.

Two things -- or a few things that I want to point out about the proposed custodians and sureties that Mr. Jones put forth.  He says that he has been with the same girlfriend for the last three years.  The Government's concerned by that only in that that means during the time that he committed the alleged crimes and also these more recent crimes, he was with that girlfriend.  Also, she said to Pretrial Services that she would need to -- need to think about it if she were going to reside with Mr. Jones.  And, so, that does give the Government some concern, as well as his mother saying that he was transient even with the explanation that Ms. Shifman offered.

What we hear is that there is no one who is really keeping tabs on Mr. Jones at any given point in time, and that does not give the Government assurance that they could actually act as an appropriate custodian to curb the danger that he presents, especially given the pattern that the Government has pointed out to the Court.

So, we return to given the seriousness of the crimes alleged here, again, given the fact that within 20 minutes, Mr. Jones at 4 a.m. was willing to jump into another third burglary, had the tools, the gloves, the masks, everything he did to show up to engage in what turned out to be a deadline endeavor and he's continued to do similar

12

burglaries since, the Government, again, presents that there are not sufficient conditions outside of detention for Mr. Jones.

THE COURT:  And would the Defense like to respond further?

MS. SHIFMAN:  A couple of things, your Honor. One, we're not suggesting that he reside with Ms. Wegland. The reason she needed to think about residing there is because she lives with her parents and other family members, and that is not something that she and I have discussed. We're suggesting that he go to New Bridge, that he comply with the conditions there, whatever length of program at New Bridge is appropriate for him, which would, of course, be a minimum of 30 days, perhaps longer.  Once he's released from New Bridge, he should return to the Courtland Avenue Address, not go to reside with Ms. Wegland because she has other family members there, and I applaud her for actually just not blurting out and answer and saying she needed to think about it and probably talk to her family members about whether that would be a viable possibility.  But we're not seeking that he be released there, nor are we suggesting that a custodian is appropriate here, your Honor.

THE COURT:  All right.  I'm ordering the Defendant detained as a danger to the community.  Several things lead me to this conclusion.

13

The instant offense alleges that he participated in an armed burglary.  Nobody gets up at 4 a.m. and races to join an armed burglary that's being committed by strangers.  He clearly knew these people, which means he very likely understood exactly what he was signing up for, including that at least one firearm was present, which means he signed up for a dangerous risk to human life.

Considering how fast he made it to the crime scene when called, I would not credit any assertion that he was surprised by the presence or use of a gun.

It is also incredibly unlikely that this is the first armed robbery he participated in with these individuals. Again, responding immediately to a call at 4 a.m. is highly indicative of prior crimes like this.

Further, the Defendant has two prior convictions of burglary, and the Government reports that he subsequently committed burglaries again in September of this year.  If I release him, he will commit more burglaries, without a doubt.

This is not just a problem of property crime, although that would be enough to justify his detention.  In the instant offense, he participated in an armed burglary that puts human life at risk.  Further, the fact of his armed burglary led to the murder of a police officer was apparently not sufficient to cause the Defendant -- or to

14

stop the Defendant from committing more burglaries, which indicates an unacceptable indifference to human life.

As for conditions of release, I do not think that there are any that would mitigate this danger, and I also don't think the Defendant is amenable to supervision. He has been convicted twice of evading the police, and he has stolen license plates in connection with the instant offense and the alleged September burglaries.

Evading police officers and then taking steps to conceal his identity mean he cannot be expected to report to a Pretrial Services Officer, and we cannot expect him to be truthful.

Pretrial release requires some trust in the Defendant and some assurance that he respects the conditions of his release, and I simply do not see that here.

I do not think that any conditions of release would mitigate the Defendants' danger to the community. Accordingly, I order him detained, and I ask the Government to prepare a draft order for my review.

MS. VOLKAR: I will, your Honor.

THE COURT: We should set a date before Judge Tigar. Other Defendants have appearances before him on February 27th. Would you like that date?

MS. SHIFMAN: That's fine for a status date, your Honor.

15

THE COURT:  Then we'll set this for status for Judge Tigar at 9:30 a.m. on February 27th.

Does the Government seek an exclusion of time?

MS. VOLKAR:  Yes, your Honor.  For the same reasons stated before, we do need to provide a more fulsome discovery production to defense counsel.  So, for effective preparation, we would seek exclusion under the Speedy Trial Act.

THE COURT:  Does the Defense agree to an exclusion of time between today and February 27th under the Speedy Trial Act?

MS. SHIFMAN:  Yes, your Honor.

THE COURT:  And do you have a written stipulation for me?

MS. SHIFMAN:  We do, and just we will be seeking the appointment of a CBA discovery attorney to coordinate. So, just as a heads up.

THE COURT:  All right.  Thank you for letting me know.  I have approved the parties stipulation to exclude time between today and February 27th -- February 27th, under the Speedy Trial Act.

Is there anything further from the Government?

MS. VOLKAR:  No, your Honor.  Thank you.

THE COURT:  Is there anything further from the Defense?

16

MS. SHIFMAN:  No, your Honor.

THE COURT:  Thank you, Counsel.

The Defendant is remanded.  The matter is submitted.

MS. SHIFMAN:  Thank you.

(Proceedings recessed at 11:58 a.m.)

17

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Thursday, December 17, 2025

EXHIBIT B

MOTION TO REOPEN DETENTION HEARING

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )   No. CR 25-00402-5-JST-5
                                    )
JOWAUN JONES,                       )
                                    )
            Defendant.              )
_____)

                                    Oakland, California
                                    Thursday, April 2, 2026


 TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
           RECORDING  10:08 - 10:25 = 17 MINUTES


APPEARANCES:

For Plaintiff:
                            United States Attorney's
                              Office
                            United States Department of
                              Justice
                            1301 Clay Street, Suite 340S
                            Oakland, California 94612
                        BY: KELLY I. VOLKAR, ESQ.

For Defendant:
                            Law Office of Gail Shifman
                            2431 Filmore Street
                            San Francisco, California
                              94115
                        BY: GAIL R. SHIFMAN, ESQ.

Transcribed by:             Echo Reporting, Inc.
                            Contracted Court Reporter/
                            Transcriber
                            echoreporting@yahoo.com

2

Thursday, April 2, 2026                                    10:08 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Now calling Criminal Matter 25-402-JST-5, United States versus Jowaun Jones.

Counsel, starting with the Government, please state your appearances for the record.

MS. VOLKAR:  Good morning, your Honor.  Kelly Volkar on behalf of the United States.

THE COURT:  Good morning.

MS. SHIFMAN:  Good morning, your Honor.  Gail Shifman on behalf of Mr. Jones, who's present in custody.

THE COURT:  Good morning.

So, the Defense has filed a motion.  The Government has responded.  So, let me start with the Defense for your further arguments.

MS. SHIFMAN:  Thank you, your Honor.  And, just for purposes of the record, Mr. Jones' family is on their way to the courthouse.  They should be probably stepping into the hearing as we're in progress.  They were just running a little bit late this morning.

THE COURT:  Thank you for letting me know.

MS. SHIFMAN:  Your Honor, so, we filed a motion to reconsider Mr. Jones' detention, and we proposed that he be released with conditions including if he's found and deemed

3

appropriate for placement at New Bridge as recommended originally by Pretrial Services.

Your Honor, we filed the motion to reconsider Mr. Jones' detention because during the detention hearing, the Government argued a number of times that Mr. Jones engaged post-offense conduct in a series of armed burglaries that are not charged, as I understand it, currently that occurred in Union City over the course of one evening or nighttime.

The Government had provided at least to me where I have access to one piece of discovery related to that, what they called during the hearing a probable cause determination, which is apparently -- I'm not sure if it's an Alameda County document per se or a Union City Police Department document, but some form of a police department document.

THE COURT:  I have a question about that.

MS. SHIFMAN:  Yeah.

THE COURT:  The Government attaches the probable cause determination as Exhibit 1 to their opposition, and they make the assertion that you were in possession of this document by the time of the detention hearing.  Is that accurate or not?

MS. SHIFMAN:  Your Honor, I did receive the document on Sunday morning.  The hearing was on Monday.  I had perused the document.  I didn't quite totally understand its contents fully.  The Government also referenced the

4

document during the hearing itself.  I'm sure your Honor had a chance to review the transcript.  And what I did not know at the time was when the Government argued the series of burglaries in September of 2025 that the Government was not in possession of discovery that indicated that these were armed burglaries.

I assumed during the course of their argument that, in fact, they had information, including the call records that are referenced in the document and the other materials that that probable cause statement refers to, and it wasn't until after the hearing when I asked for the additional discovery related to those burglaries that I was informed that everything that the Government had regarding those burglaries was that one document.

THE COURT:  I want to make sure I understand your motion.  I believe that you're moving for reconsideration on two grounds, but tell me if I'm wrong and if there's something I've missed.

The first ground is that at the hearing, the Government said that the subsequent burglaries were armed burglaries, and my detention order repeats that assertion that they were armed burglaries.  However, in fact, those later burglaries in Union City were not armed burglaries.

And, so, point number one is that the Government said armed burglaries, and the Court's order says armed

5

burglaries.  In fact, they were not armed burglaries.

But I also think point number two is your taking issue with whether there is evidence that the Defendant was present at six of the eight Union City burglaries as alleged in the probable cause determination.

Is -- did I capture -- are there other grounds or did I capture the -- the bases for this motion?

MS. SHIFMAN:  That's the -- those are the bases for the motion, your Honor.

With regard to the second ground -- or, actually, let me go back to the first ground.

THE COURT:  I actually want to start with the second one.

MS. SHIFMAN:  Sure.

THE COURT:  Because the -- the second ground I guess I'm not sure I see that.  The -- I did make the assumption or accept the Government's argument that there was evidence that the Defendant was present at six of the eight Union City burglaries, and it looks to me like the probable cause document continues to state that, that it says that target telephone number one was his and that it was present at six of the eight locations.

I understand that you say that the assertion that it was his is conclusory and it consists of a sentence, and I see that that's true, but it -- I didn't see contrary

6

evidence or a reason to doubt that the target telephone number one was his and that it was present at six of the eight locations.  So, maybe you can direct me.  If there's something I'm missing that you think undermines the -- the basis to believe he was present at those robberies -- or burglaries, why don't you go ahead and highlight that.

MS. SHIFMAN:  Well, your Honor, and you're right.  I don't have contrary evidence because I'm obviously not in possession of the underlying discovery, and neither is the Government.  So, this conclusory statement is just that.  It's a conclusory statement when he is arrested subsequent, my understanding is he's not in possession of that particular phone.  So, there is nothing other than, as I understand it, that conclusory statement saying he is the owner of that phone.

And, you know, prior to filing the motion, I mean, had I seen discovery that, in fact, that is an accurate statement, I wouldn't have raised that ground.  But we aren't in possession of anything that supports that, and what we do know is in the probable cause statement itself, it -- it says that they located his car and they -- it seems like they're trying to tie it to those burglaries in September of 2025 as well when, in fact, when you drill down on that, you realize, no, no, no.  What was present in September of 2025 is a different vehicle than the vehicle he

7

is seen accessing when they observed him.  So -- but it's not clear really no its face until you really drill down on the document itself and kind of, frankly, take notes and follow the target phones and follow everything else before you realize, no, those are two different cars and the probable cause statement is sort of carefully and artfully drafted to make it seem like they are the same vehicle which also, to me, raises a doubt about the conclusion that he was, in fact, the owner of that phone in September of 2025. There's no evidence of that other than the conclusion.

THE COURT:  Well, I don't -- as to the second ground, I did not rely on the cars.  I relied on the Government's assertion that he was present at six of the eight burglaries, and this probable cause statement does state that target telephone number one was his and that it was present at six of the eight burglaries.  So, I don't think you've come up with new material that wasn't previously available to you that is material to the question of whether he was present.  So, I -- I think that the basis for my finding that he was present at these later burglaries continues to be correct, and I don't think you've come up with anything that -- that changes what was in front of me before.

Let's go back to issue number one, which is that you're right, there was no evidence that he was armed at the later

8

burglaries.  So, we need to think about that.  And I've gone back, and I've reread the Government's detention motion, and they said he was involved in later burglaries in Union City, but the detention motion didn't say they were armed.  And I've looked through the transcript at my reasons that I stated on the record for detaining the Defendant, and I stated that he -- there was evidence that he was involved on later burglaries, but I did not state that they were armed, and you're correct that the AUSA did state during the hearing that he was armed at those later hearings and then when the Government submitted a proposed detention order to me, that error was contained in the order but I did not say at the hearing that I thought he was armed at the later burglaries, and the Government's detention motion did not make that assertion.  And, so, I don't think that I concluded -- I stated my reasons on the record, and those were the reasons I gave for detaining the Defendant, and I did not include among those reasons that he was armed at the later burglaries.

So, I think what has happened here is that there was a scrivener's error in the detention order.  The Government submitted an order that said he was armed at the later burglaries, and I signed off on that.  However, I should have reviewed it more closely.  In fact, his being armed at the later burglaries, which wasn't true, was not part of the

9

basis for my detention order.  So, I think you spotted an error in the order, but it -- it was just an error in the -- taking my oral order and rendering it in writing.

MS. SHIFMAN:  Well, your Honor, if I may, the Government argued throughout their argument that Mr. Jones engaged in reckless behavior that put at jeopardy, you know, the -- the lives of others in the September 2025 series of burglaries, and not only did they argue more than once that the burglaries were armed, but they argued that there was a willingness to continue to engage in such reckless behavior since those events.  Even knowing that there could be a potential fatal outcome, they did argue that to your Honor.

And then when you did make your ruling in the court that day in the transcript, you adopted the argument for purposes of the hearing.  When you made your finding, you said that the underlying charged offense -- offenses were "apparently not sufficient to cause the Defendant -- or to stop the Defendant from committing more burglaries, which indicates an unacceptable indifference to human life.  And it's that last clause there that seems to be adopting the notion that these were armed burglaries, as is alleged in the underlying offense, at least with regard to other Defendants.

And, so --

THE COURT:  Well, if I understand correctly,

10

they're not alleging that the Defendant was armed in the underlying offense.

MS. SHIFMAN:  That's --

THE COURT:  Just --

MS. SHIFMAN:  That's correct.

THE COURT:  -- somebody else was armed --

MS. SHIFMAN:  Yes.

THE COURT:  -- and that somebody else ended up killing somebody.  And, so, it was the Defendant's willingness, even though he personally was unarmed, to participate in a burglary in which somebody else was armed that led to someone being killed, and that's why I said in continuing participation in burglaries, even though he personally was unarmed, raised that risk of -- of -- to human life.  It was that he was doing a similar thing to what he had done before, but I don't believe -- in any of the burglaries that have been presented to me, I don't believe that he personally was armed in any of them.  Is that right?

MS. SHIFMAN:  As I understand it, that's correct.

THE COURT:  Okay.

MS. SHIFMAN:  Well, your Honor, the reason we brought this is because, to us, that was not apparent on the record, and it became very clear that the September 2025 burglaries were unarmed and that the Government didn't

11

possess any discovery to support the argument that they repeated before your Honor multiple times and included in the proposed order that ultimately got signed by the Court.

So, from our perspective, it seemed that the Court adopted that argument as presented and as proffered by the Government.

THE COURT:  I understand why you brought this motion, and there was an error in the detention order, and you are right that the AUSA misspoke and said things at the detention hearing that turned -- that were not accurate.  He -- he was not armed at the alleged Union City burglaries.  And, so, I see no fault in bringing this motion.  However, ultimately, I believe it's incorrect because I did -- I was -- I did not, in fact, conclude that he was armed at the later Union City burglaries, and my findings followed from the Government's written detention motion and not from the misstatement at the hearing that he was armed at the later ones.

However, my detention order does need to be corrected to indicate that he had later -- or alleged later burglaries but not later armed burglaries.  So, I entirely understand why you brought this motion.

But let me turn to the Government.  Is there anything further you would like to add?

MS. VOLKAR:  Only, your Honor, to say that I

12

regret the misstatement at the prior hearing.  I was the AUSA here that day.  I apologize to the Court, to Defense Counsel, and to the Defendant for making that misstatement on the record and not carrying forward with the same precision that we had brought in drafting our detention memo.  But as we argued to your -- to your Honor, we do not believe there was any new information because defense counsel did have the PC declaration.  It -- there was not particularly voluminous discovery that was provided in advance of the detention hearing.  Defense counsel had before her then everything that she has before her today, and, so, we do believe that the -- and, as the Court stated in its oral ruling, it did not follow the Government in making the misstatement or the inaccuracy of stating that the subsequent burglaries were armed, and we still think that there's significant other bases, including the actual events of which he's currently charged with that support the Court's detention order.

So, I just want to apologize for the misstatement.  The Government values accuracy, but we do believe that detention is still the proper outcome here.

THE COURT:  Thank you, Counsel.

I'm denying the Defendant's motion for reconsideration. I do not believe that the Defense has proffered new information that's material to the decision about whether to

13

detain.

As for whether there was evidence that the Defendant was present at the alleged Union City burglaries, the probable cause document continues to provide a basis to think that that is true.  So, nothing is different.

And the Court's finding on the record was that there was evidence that the Defendant had participated in later burglaries in Union City.  I did not say on the record that I thought they were armed burglaries, and the Government's detention motion likewise did not make the contention that they were armed burglaries.

The Government did misspeak during the hearing and did submit a proposed detention order that contained an error stating that the Defendant was armed in the later burglaries but that that was not the basis for the Court's order detaining the Defendant.

And, so, I ask the Government to please submit a proposed corrected detention order that removes the scrivener's error about the Defendant being armed in the later burglaries.

MS. VOLKAR:  Sill do, your Honor.

THE COURT:  All right.  Is there anything further from the Defense this morning?

MS. SHIFMAN:  No, your Honor.

THE COURT:  Anything further from the Government?

14

MS. VOLKAR:  No, your Honor.

THE COURT:  All right.  Thank you, Counsel.

The matter is submitted, and the Defendant is remanded.

MS. SHIFMAN:  I think we have a date already scheduled before Judge Tigar.

THE COURT:  I was assuming that was the case.  Is that correct, Government?

MS. VOLKAR:  That's correct, your Honor, April 17th.

THE COURT:  Okay.  Thank you, Counsel.

MS. SHIFMAN:  Thank you.

(Proceedings adjourned at 10:25 a.m.)

15

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Thursday, April 2, 2026