CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ALETHEA M. SARGENT (CABN 288222)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    alethea.sargent@usdoj.gov
    Kelly.Volkar@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 4:25-CR-0402-JST-TSH-5 |
| Plaintiff, | ) |
| v. | ) UNITED STATES' OPPOSITION TO |
| | ) DEFENDANT'S MOTION TO REVOKE |
| JOWAUN JONES, | ) DETENTION ORDER PER 18 U.S.C. § 3145 |
| Defendant. | ) |

U.S. OPP. TO REVOKE DETENTION ORDER
CASE NO. 4:25-CR-0402-JST-TSH-5

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

      A.     First Burglary ..............................................................................................2

      B.     Second Burglary.............................................................................................4

      C.     Recruitment and Third Burglary ...................................................................5

      D.     High-Speed Chase and Fatal Shooting of OPD Officer........................................5

      E.     Jones's Subsequent Crimes.............................................................................7

      F.     Procedural Background....................................................................................8

ARGUMENT ......................................................................................................................10

      A.     Legal Standards...............................................................................................10

      B.     Jones Should Be Detained Because No Set of Conditions Can Mitigate the Danger He Poses to the Community.......................................................................12

CONCLUSION....................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*United States v. Castaneda*,
  No. 18-cr-00047-BLF-1, 2018 WL 888744 (N.D. Cal. Feb. 14, 2018) .......................................................... 11

*United States v. Daychild*,
  357 F.3d 1082 (9th Cir. 2004) ................................................................................................. 13

*United States v. Diaz-Hernandez*,
  943 F.3d 1196 (9th Cir. 2019) ................................................................................................. 11

*United States v. Hir*,
  517 F.3d 1081 (9th Cir. 2008) ............................................................................................. 11, 14

*United States v. Koenig*,
  912 F.2d 1190 (9th Cir. 1990) ........................................................................................ 11-12, 12

*United States v. Motamedi*,
  767 F.2d 1403 (9th Cir. 1985) ................................................................................................. 11

*United States v. Salerno*,
  481 U.S. 739 (1987) ................................................................................................................ 12

*United States v. Thomas*,
  667 F. Supp. 727 (D. Or. 1987) ............................................................................................... 11

*United States v. Torres*,
  911 F.3d 1253 (9th Cir. 2019) ................................................................................................. 13

*United States v. Zaragoza*,
  No. CR-08-0083 PJH, 2008 WL 686825 (N.D. Cal. Mar. 10, 2008) ............................................... 13

**Statutes**

18 U.S.C. § 3142 ........................................................................................................................ *passim*

**INTRODUCTION**

Defendant Jowaun Jones requests—nearly four months after Magistrate Judge Thomas S. Hixson ordered him and several of his co-defendants detained following multiple contested detention hearings—this Court to revoke that detention order.  Dkt. 150 ("Motion").  Magistrate Judge Hixson ordered Jones detained as a danger to the community after considering information and materials presented by the parties at two hearings addressing detention (the original hearing on December 15, 2025, and a motion to reconsider, reopen, and revoke the order held on April 2, 2026).  Though this Court reviews those findings without deference, there is no new information presented by Jones that should lead this Court to reach a different conclusion.

On December 29, 2023, Jones answered a call from his co-conspirator, Sebron Russell, around 4:00 a.m.—and arrived within mere minutes of answering the call—near the vicinity of a marijuana grow facility to help perpetrate a third armed burglary of the facility that night.  Plain clothes Oakland Police Department (OPD) officers responded to the third burglary and, during the chase of perpetrators that ensued, Officer Tuan Le was shot in the back of the head and succumbed to his fatal wounds.  As described below, Jones was well aware of the murder of Officer Le that occurred that night, yet, undeterred, Jones continued to commit additional commercial burglaries.

Magistrate Judge Hixson ordered detained pretrial Jones and two other co-defendants who had also continued to commit additional crimes after the events of December 29, 2023, and additional more culpable co-defendants waived detention findings.  Jones moved to reopen, reconsider, and revoke detention based on two reasons, both of which relate to the subsequent burglaries Jones committed, which he reiterates here as supporting revoking Judge Hixson's detention order.  *See* Dkt. 150 at 6–8.

The government contends that, based on the nature and circumstances of this heinous crime, the weight of the evidence, the danger posed by Jones, and the history and characteristics of the defendant, there are "no condition or combination of conditions [that] will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  This Court should deny the defendant's Motion because the primary rationale underlying Judge Hixson's oral detention order remains unchanged and unchallenged, namely:

The instant offense alleges that [Jones] participated in an armed burglary. Nobody gets up at 4 a.m. and races to join an armed burglary that's being committed by strangers. He clearly knew these people, which means he very likely understood exactly what he was signing up for, including that at least one firearm was present, which means he signed up for a dangerous risk to human life.

Considering how fast he made it to the crime scene when called, I would not credit any assertion that he was surprised by the presence or use of a gun.

It is also incredibly unlikely that this is the first armed robbery he participated in with these individuals. Again, responding immediately to a call at 4 a.m. is highly indicative of prior crimes like this. Further, the Defendant has two prior convictions of burglary, and the Government reports that he subsequently committed burglaries again in September of this year. If I release him, he will commit more burglaries, without a doubt.

This is not just a problem of property crime, although that would be enough to justify his detention. In the instant offense, he participated in an armed burglary that puts human life at risk. Further, the fact of his armed burglary led to the murder of a police officer was apparently not sufficient to . . . stop [Jones] from committing more burglaries, which indicates an unacceptable indifference to human life.

As for conditions of release, I do not think that there are any that would mitigate this danger, and I also don't think [Jones] is amenable to supervision. He has been convicted twice of evading the police, and he has stolen license plates in connection with the instant offense and the alleged September burglaries. Evading police officers and then taking steps to conceal his identity mean he cannot be expected to report to a Pretrial Services Officer, and we cannot expect him to be truthful. Pretrial release requires some trust in the Defendant and some assurances that he respects the conditions of his release, and I simply do not see that here.

Dkt. 150 at 22–23.

The Court should deny the Motion for the same reasons.

## BACKGROUND

### A.    First Burglary

Between the evening of December 28, 2023, through the early morning of December 29, 2023, four individuals, Allen Brown, Sebron Russell, Marquise Cooper, and an unnamed co-conspirator, organized and perpetrated a series of three separate armed burglaries of a marijuana grow facility at 499 Embarcadero Unit B, Oakland, California. At approximately 12:41 a.m. on December 29, 2023, Brown, Russell, and the unnamed co-conspirator arrived at 499 Embarcadero in two vehicles, a silver Honda Accord and a black Infiniti. The perpetrators wore masks and gloves and came bearing crowbars:



*12:45 a.m.: Brown, Co-Conspirator 1, and Russell on Landing*

Once on the landing, Brown, Russell, and the unnamed co-conspirator destroyed the lights and used the crowbar to break into the facility, with Brown and the unnamed co-conspirator passing a gun back and forth between them.  A fourth individual, Cooper, served as a lookout some distance away.

Once the perpetrators successfully gained entry to the marijuana grow facility, Brown used the firearm to clear the rooms while the unnamed co-conspirator lit the way.






*12:59 a.m.: Brown, With Co-Conspirator 1, Using Gun to Clear Rooms*

U.S. OPP. TO REVOKE DETENTION ORDER
CASE NO. 4:25-CR-0402-JST-TSH-5                3

Shortly after breaking into the building, Brown, Russell, and the unnamed co-conspirator each carried copious amounts of marijuana plants to their waiting vehicle.

 

*1:00 – 1:01 am: Co-Conspirator 1 and Brown Carrying Plants*

The three filled the black Infiniti before fleeing at approximately 1:04 a.m., shortly before the arrival of undercover OPD officers, who had been dispatched to the scene.  Cooper maintained contact with Brown over their cell phones during the first burglary.

**B.     Second Burglary**

After transporting the stolen marijuana to another site and briefly resting, Brown, Russell, Cooper, and the unnamed co-conspirator returned to the same marijuana grow facility at approximately 3:41 a.m.  They drove the same vehicles, and Cooper once again acted as the lookout and remained in contact with Brown, who stayed with the car.  The group took so many marijuana plants out of the facility that Brown and Russell had to forcibly close the trunk and store some plants in the back seat.

 

*3:48 – 3:49 am: Russell and Brown Loading the Car*

The perpetrators drove away at approximately 3:52 a.m.  During the first two burglaries, the perpetrators stole more than 400 marijuana plants, but more than 100 marijuana plants remained in the

building.  At 3:53 a.m., they started to call in recruitments, including Jones.

### C.      Recruitment and Third Burglary

Beginning at 3:54 a.m. on December 29, 2023, Russell began calling in reinforcements, including Jones and co-defendants Shawn McGee and Salvador Munguia.  Russell and each of these enlisted defendants exchanged multiple phone calls within a 10–20-minute window in the early hours of the morning.  Specifically, based on cellular location information, Russell called Jones four times within less than twenty minutes around 4:00 a.m., and after answering, Jones traveled to the vicinity of the third armed burglary in under 10 minutes.  The enlisted defendants, including Jones, brought additional vehicles—likely intended to transport the large quantity of still-remaining marijuana plants.  The vehicle that Jones drove to the location on December 29, 2023, bore a fictitious license plate bearing a plate number matching a real car very similar to his own, which is a tactic often used to help evade identification and capture by law enforcement.

The group converged at 499 Embarcadero at approximately 4:26 a.m. on December 29, 2023, according to cellular location information.  Wearing masks and gloves, Jones and others entered the unoccupied warehouse, while Brown stayed in the driver's seat of the black Infiniti and Cooper remained separated from the group as the lookout.



*4:31 – 4:33 am: The Defendants File into the Building a Final Time*

### D.      High-Speed Chase and Fatal Shooting of OPD Officer

At approximately 4:33 a.m. on December 29, 2023, OPD officers were again dispatched to the in-progress burglary.  The dispatched officers included Officer Tuan Le and his partner, who rode together in an unmarked white truck.  As Officer Le and his partner pulled into the parking lot of the building, Jones and co-defendants McGee, Munguia, Russell, and the unnamed co-conspirator ran down

the steps of the warehouse and fled toward their vehicles. The unnamed co-conspirator was one of the last to exit the warehouse, leaving behind him a single glove, which would later be tested and determined to contain his DNA. As he fled, he brandished a pistol at the officers' truck as Russell watched from the top of the stairs.



*4:37 am: Russell at Top of Stairs; Co-Conspirator 1 Brandishing at Officers*

The unnamed co-conspirator entered the black Infiniti, with Brown in the driver's seat, and exited the parking lot.



*4:37 am: Co-Conspirator 1 Climbs into the Passenger Seat of Brown's Car*

As Jones, McGee, Munguia, Brown, Russell, and the unnamed co-conspirator drove toward the highway in their vehicles, Officer Le and his partner followed a Chevrolet Malibu in which multiple of

the suspects had fled. As the vehicles traveled along Embarcadero, Brown's black Infiniti pulled behind Officer Le's vehicle. As the suspect vehicles approached the southbound Interstate 880 on-ramp, the unnamed co-conspirator, sitting in the passenger seat of Brown's vehicle, fired more than 20 shots at the back of the officers' vehicle, striking Officer Tuan Le in the head and killing him.

**E.     Jones's Subsequent Crimes**

Following the shooting, a manhunt commenced, and the defendants hid, with the unnamed co-conspirator even conscripting his mother and girlfriend to furnish him with one-way plane tickets to Atlanta, Georgia. Despite their efforts, though, the unnamed co-conspirator, Brown, Russell, and Cooper were apprehended within a few days.

Jones and other co-defendants, however, were not immediately apprehended. On January 2, 2024, Jones, using the same phone number that Russell had called around 4:00 a.m. on December 29, 2023, spoke with Russell while Russell was in Santa Rita Jail. US-0001080.[1] During the call, Jones asked Russell who else had been arrested. *Id.* Two days later, another individual at Santa Rita Jail, an associate of both Russell and Jones, called Jones. Jones asked after Russell, and when the other individual declined to say anything, Jones said, "I already know about everything else, I was just seeing if you still in there with him [*i.e.*, Russell]." *Id.* Jones subsequently instructed the same associate to not "talk about that shit at all" and instead write it down because law enforcement could be listening. *Id.*

Despite knowing that his actions that night had culminated in the murder of a police officer, for which Russell had been arrested—Jones continued undeterred committing burglaries. *See* Dkt. 70 at 7–8 (detailing other co-defendants' subsequent crimes, as well). As the government described in its detention memorandum, two co-defendants subsequently committed firearms-related crimes, one of them also committing a burglary in which some of the crew were armed. *See* Dkt. 70 at 7–8 (detailing other co-defendants' subsequent crimes). Jones also committed subsequent burglaries, although no firearms were reported as part of those burglaries. *See* Dkt. 143-1.

Specifically, Jones took part, on September 12 and again on September 17, 2025, in multiple successive burglaries in Union City between approximately 3:00 a.m. and 5:00 a.m. Dkt. 143-1. On

---

[1] This document was provided to defense counsel in pre-detention-hearing discovery on December 13, 2025.

September 17, 2025, three commercial burglaries occurred between approximately 3:40 a.m. and 4:43 a.m., and for each of the three burglaries, the two suspects shattered the front glass window before ransacking the store. *Id.* No firearm was observed. *Id.* Through call detail records and a ping register warrant, Jowaun Jones was identified as one of the perpetrators. *Id.* For one of the burglaries, Jones used a stolen license plate for the vehicle. *Id.* This same tactic was used by Jones on December 29, 2023, when the vehicle he was driving bore a fictitious license plate. In addition, while tracking Jones through a ping warrant, law enforcement identified Jones in the vicinity of another commercial burglary that occurred in Milpitas on October 30, 2025. *Id.* at 8. At the county level, the case against Jones appears to have been discharged for further investigation.

### F.    Procedural Background

On November 20, 2025, a federal grand jury indicted Jones and eight co-defendants for their respective roles in the above-described conduct starting on December 28, 2023, and continuing for the following few days. Dkt. 1.

On December 11, 2025, Jones had his initial appearance and was arraigned on the underlying charges, along with most of his co-defendants. Dkt. 51. The detention hearing was set for December 15, 2025, and the government filed it detention memorandum on December 13, 2025. Dkt. 70. Also on December 13, 2025—two days before the detention hearing—the government produced nine documents in limited discovery relevant to the detention hearing to defense counsel. *See* Dkt. 143-1, Declaration of Alethea M. Sargent ("Sargent Decl.") ¶ 2. One of the nine documents was US-0001076–85, which detailed how law enforcement identified some of the enlisted defendants the night of the underlying conduct, including Jones. Another of the nine documents, and the only one related to Jones's subsequent conduct, was a six-page probable cause declaration relating to Jones's involvement in subsequent burglaries in Union City, including descriptions of how the suspects shattered front glass windows. Dkt. 143-1, Sargent Decl. ¶¶ 2–3 & Exhibit 1. The probable cause declaration details how Jones was identified, including through search warrants that sought subscriber information associated with a target phone number. *See* Sargent Decl. Exhibit 1 (Dkt. 143-1 at 6–7). The government received a notification that defendant's counsel accessed the discovery the following day on December 14, 2025, at 10:01 a.m., and defense counsel confirmed in court that she had received the discovery. Sargent Decl.

¶ 4 & Exhibit 2 (Dkt. 143-1 at 11); Dkt. 150 at 15.

On December 15, 2025, Magistrate Judge Hixson heard argument from both parties in a contested detention hearing. *See* Dkt. 150 at 10–26. Magistrate Judge Hixson also heard argument from several co-defendants in multiple contested detention hearings that occurred on the same day. *See* Dkts. 76, 86, & 90. In the hearing relating to Jones, as with several co-defendants, the government focused on the heinousness of the events on December 29, 2023, and also argued that, despite the horrific outcome of that night, Jones and two other co-defendants were undeterred from committing similar crimes subsequent to that night, as it had argued in the detention memo. *See* Dkt. 150 at 13–15. With respect to Jones, at the hearing, the government mistakenly twice identified his involvement in subsequent burglaries in Union City as *armed*, which was accurate for the other defendant who had committed a subsequent burglary but inaccurate for Jones. *See id.* The government also emphasized Jones's criminal history in totality, which involved multiple arrests for firearms-related charges. *Id.* at 16.

As set forth at length above, Magistrate Judge Hixson did not adopt the government's inadvertent reference to the subsequent Union City burglaries as armed and, indeed, focused primarily on the underlying charged offense in holding:

> Nobody gets up at 4 a.m. and races to join an armed burglary that's being committed by strangers. He clearly knew these people, which means he very likely understood exactly what he was signing up for, including that at least one firearm was present, which means he signed up for a dangerous risk to human life.
>
> Considering how fast he made it to the crime scene when called, I would not credit any assertion that he was surprised by the presence or use of a gun.
>
> It is also incredibly unlikely that this is the first armed robbery he participated in with these individuals. Again, responding immediately to a call at 4 a.m. is highly indicative of prior crimes like this. Further, the Defendant has two prior convictions of burglary, and the Government reports that he subsequently committed burglaries again in September of this year. If I release him, he will commit more burglaries, without a doubt.
>
> This is not just a problem of property crime, although that would be enough to justify his detention. In the instant offense, he participated in an armed burglary that puts human life at risk. Further, the fact of his armed burglary led to the murder of a police officer was apparently not sufficient to . . . stop [Jones] from committing more burglaries, which indicates an unacceptable indifference to human life.

Dkt. 150 at 22–23. Judge Hixson also noted the defendant's efforts to evade police detection based on his criminal history and switching license plates in the underlying offense. *Id.* Judge Hixson requested that the government prepare a proposed detention order, in which proposed order the government

mistakenly referred to the subsequent Union City burglaries as armed. Dkt. 88.  That error was subsequently corrected following the defendant's motion to reconsider or reopen. *See* Dkt. 147.

On March 19, 2026, four months later, Jones moved to reconsider/reopen detention proceedings based on new arguments relating to the same six-page document first produced on December 13, 2025. *See* Dkt. 143-1, Sargent Decl. ¶¶ 2–4 & Exhibits 1 & 2; *see also* Dkt. 150 at 30.  The government opposed, arguing that there was no new material evidence.  Dkt. 143.

On April 2, 2026, Magistrate Judge Hixson held a second hearing regarding Jones's pretrial detention. *See* Dkt. 150 at 28–42.  Judge Hixson confirmed that the two bases for Jones's motion were the inadvertent reference to the subsequent burglaries as "armed" and a challenge to the identification of Jones as connected with the subsequent burglaries in Union City. *Id.* at 31–32.  For the latter argument, Judge Hixson found that the six-page probable cause determination submitted by the government adequately supported its assertion that Jones was indeed involved in the subsequent burglaries. *Id.* at 32–34.  Jones, through his defense counsel, confirmed that he had no contradictory evidence. *Id.*  For the former argument, Magistrate Judge Hixson acknowledged the government's error at the hearing but stated that he "did not include among th[e] reasons [for detaining Jones] that he was armed at the later burglaries." *Id.* at 34–36.  Thus, Judge Hixson viewed the original detention order as containing a "scrivener's error" that the court asked the government to correct. *Id.* at 35, 40.

At the conclusion of the second hearing, Magistrate Judge Hixson denied Jones's motion for reconsideration because Jones had not "proffered new information that's material to the decision about whether to detain." *Id.* at 39–40.  Judge Hixson found that the government proffered a sufficient basis to believe Jones was involved in the subsequent Union City burglaries and, while the government did "misspeak during the hearing[,]" the court had not relied on the subsequent burglaries being armed as "the basis for the Court's order detaining the Defendant." *Id.*

## ARGUMENT

### A.    Legal Standards

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).  Detention is appropriate

where defendant is either a flight risk or a danger to the community; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). While a finding that a defendant is a danger to the community must be supported by clear and convincing evidence, 18 U.S.C. § 3142(f), a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406.

"[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019).  In determining whether pretrial detention is appropriate, the court must consider information regarding (1) the nature and circumstances of the charged offense; (2) the weight of the evidence; (3) the danger posed by the defendant to any person or the community; and (4) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, employment, financial resources, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole.  18 U.S.C. § 3142(g).

Because this is a Controlled Substances Act "offense for which a maximum term of imprisonment of ten years or more is prescribed" (*id.* § 3142(f)(1)(C)), "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]"  18 U.S.C. § 3142(e)(3)(E).  Once this presumption is triggered, "the defendant [must] produce some credible evidence forming a basis for his contention that he will appear and not pose a threat to the community in order to rebut the presumption." *United States v. Thomas*, 667 F. Supp. 727, 728 (D. Or. 1987); *see also United States v. Castaneda*, No. 18-CR-00047-BLF-1, 2018 WL 888744, at *4 (N.D. Cal. Feb. 14, 2018).  And even where a defendant offers evidence to rebut the presumption, courts consider the four § 3142(g) factors to determine whether the pretrial detention standard is met.  *See United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).  Moreover, "[t]he presumption [of detention] is not erased when a defendant proffers evidence to rebut it; rather the presumption remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *Id.* (internal quotation omitted).

A district court conducts a *de novo* review of a magistrate's order or detention. *United States v.*

*Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). On appeal of a magistrate judge's detention order, the Court "is not required to start over in every case," but "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *Id. at* 1193. In doing so, the Court is not limited to facts already presented to the magistrate judge. *Id.*

The rules of evidence do not apply at a detention hearing, 18 U.S.C. § 3142(f), and the government may present evidence by way of evidentiary proffer sufficient to make the Court aware of the defendant's role in the offense, the weight of the evidence, and other relevant factors. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 742–43 (1987).

### B. Jones Should Be Detained Because No Set of Conditions Can Mitigate the Danger He Poses to the Community

Magistrate Judge Hixson correctly determined that the relevant § 3142(g) factors weigh in favor of detaining Jones pretrial because he is a danger to the public. This is demonstrated not only by the severity of the crime at issue but also by Jones's subsequent commission of additional early morning burglaries—perpetrated after Jones was well aware that the co-conspirators' actions on December 29, 2023, had led to an officer's death, as evidenced by his phone conversations with and about Russell at Santa Rita Jail. Furthermore, Judge Hixson appropriately determined that Jones is not amenable to supervision given his prior convictions for evading the police and multiple instances of using false license plates to evade capture following burglaries.

#### 1. Nature and Circumstances of the Offense

Russell, Brown, and their unnamed co-conspirator planned and organized an armed burglary of a marijuana grow facility in Oakland, brought a firearm with them, and Brown even used the firearm to clear the rooms—evincing a willingness to use the gun should they have found anyone inside. By these actions, they recklessly and willfully accepted the risk that someone would be hurt or killed. After filling their cars to the brim with at least 400 marijuana plants during two armed burglaries hours apart, at a little before 4:00 a.m., they decided to bring more individuals into their high-stakes operation.

Indeed, phone records show they enlisted reliable reinforcements—including Jones—who immediately came to redouble the efforts. Jones and other co-defendants answered the call and within

10–20 minutes joined Russell and Brown to commit a third armed burglary. Call data records show Jones was called by Russell and then, within mere minutes, relocated from south Oakland to a spot near the marijuana grow facility. Law enforcement identified the car Jones drove, though he was driving it with a fictitious license plate. Jones and the other recruits arrived with masks and gloves. The subsequent conversations between Jones and Russell after Russell was arrested—but Jones was not—for the events on December 29, 2023, show that Jones and Russell were close and knew not to talk about the crimes on the recorded jail calls. In short, Russell called in reinforcements poised to make the situation even more explosive.

The danger posed to the community by firearms and drug offenses is well-established. *See*, *e.g.*, *United States v. Daychild*, 357 F.3d 1082, 1100 (9th Cir. 2004) (approving detention on danger prong due to defendant's possession of firearms and stating that "danger posed to the public by armed conspirators who traffic in illicit drugs is too plain to permit dispute"); *United States v. Torres*, 911 F.3d 1253, 1264 (9th Cir. 2019) (internal quotation marks omitted) (Congress passed firearm laws to "disarm groups whose members Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities of citizenship"); *see also United States v. Zaragoza*, 2008 WL 686825, at *3 (N.D. Cal. Mar. 11, 2008) (Spero, J.) ("In assessing danger, physical violence is not the only form of danger contemplated by the statute. Danger to the community can be in the form of continued narcotics activity or even encompass pecuniary or economic harm.").

That danger was realized in this particular case. Two undercover OPD vehicles arrived at the marijuana grow facility around 4:30 a.m. The perpetrators fled in different directions, with the unnamed co-conspirator brandishing a firearm at the officers to help the defendants here escape capture that morning. But that was not enough. The unnamed co-conspirator, Brown, and Russell left in vehicles that OPD followed. Brown tailed Officer Le's undercover vehicle as Officer Le himself pursued other fleeing suspects, and the unnamed co-conspirator in his passenger seat opened fire—shooting more than 20 shots at the back of an unmarked OPD vehicle and fatally striking Officer Le in the head.

Jones, having apparently escaped capture for many months, had a choice to make, after he realized that the burglary he had so eagerly participated in led to the murder of a police officer: he could have chosen to stop committing crime. But he did not. Nor did his co-conspirators. Co-defendants

Booth and McGee were subsequently arrested for firearms-related crimes, and Jones continued to commit burglaries often in the early morning between 3:00 a.m. and 5:00 a.m., cold-plating the vehicle he was in to prevent detection. The horror of the early morning of December 29, 2023, did not phase Jones. That he persisted after that night in and of itself is testament to his danger to the community—he continued to engage in reckless and criminal behavior that evinces utter apathy toward who might die.

### 2. Weight of the Evidence

The weight of the evidence against defendants Jones and his co-defendants is strong and is only likely to get stronger with time. The investigation into this case has been voluminous, and the evidence is multi-pronged, consisting of, among other things, surveillance, call detail records, DNA forensics, phone extractions, vehicle identifications, iCloud extractions, interviews, and more. Here, the unnamed co-conspirator, Brown, and Russell are readily identifiable on surveillance; call detail records show with precision their movements across the night; call detail records and vehicle identifications conclusively place Jones and other recruitments arriving at and fleeing from the third attempted burglary; surveillance shows Jones and others coming up and running down the stairs; and phone extractions detail the unnamed co-conspirator's efforts to flee the area. While the weight of the evidence is deemed the least important factor by case law, courts are still "require[d]" to consider it, and it can help establish dangerousness. *Hir*, 517 F.3d at 1090 (finding that "the weight of the evidence clearly and convincingly establishe[d]" a likelihood that the defendant would pose a danger if released).

### 3. The Danger Posed by and History and Characteristics of the Defendant

The history and characteristics of Jowaun Jones weigh in favor of detention. Magistrate Judge Hixson recognized that "[n]obody gets up at 4 a.m. and races to join an armed burglary that's being committed by strangers." Dkt. 150 at 22–23. Similarly, "[i]t is also incredibly unlikely that this is the first armed robbery he participated in with these individuals [because] responding immediately to a call at 4 a.m. is highly indicative of prior crimes like this," particularly "[c]onsidering how fast he made it to the crime scene when called[.]" *Id.* Judge Hixson appropriately found that Jones "clearly knew these people, which means he very likely understood exactly what he was signing up for, including that at least one firearm was present, which means he signed up for a dangerous risk to human life." *Id.* Indeed, Jones spoke with Russell via jail calls the day after he was arrested and also spoke with another

associate about Russell and "that shit" over the subsequent few days.  US-0001080.  The close tie between him and Russell was why Jones answered the call from Russell and arrived at the scene mere minutes later.  Jones was ready and willing to join an armed burglary in the early hours of the morning on December 29, 2023.  Notably, Russell, who helped plan the events that night and recruited the most additional perpetrators—calling eight separate individuals, including Jones—has previously been convicted twice for commercial burglaries, once for evading peace officers, and for being a felon in possession of a firearm.  Dkt. 70 at 12–13.

Jones also has a significant criminal history.  He has nineteen arrests, including for assault with a deadly weapon and firearms, and he has been convicted twice for burglary, twice for evading peace officers, and once for possession with intent to sell narcotics.  In addition to sentences in county jail he has also served time in state prison.

It was not surprising that Jones was ready and willing to answer Russell's call and join an armed burglary at 4 in the morning.  A probable cause declaration notes that call data records place Jones at six out of eight burglaries in Union City, and a subsequent ping warrant puts him in the vicinity of yet another burglary in October 2025 in Milpitas (*see* Dkt. 143-1 at 8).  During the instant investigation, Jones used a fictitious license plate on his vehicle, making it more difficult for law enforcement to identify him from his vehicle—a practice he repeated in the subsequent Union City burglaries in September 2025.

More significantly as to this case—and as Jones's criminal history would suggest—Russell called Jones four times within fifteen minutes around 4:00 a.m., and after Jones answered, he traveled to the vicinity of the third armed burglary within 10 minutes.  Jones was ready and willing to join an armed burglary in the early hours of the morning.  What is surprising, and strongly militates toward detention, is that, following his involvement in events that led to an officer's murder, Jones has continued to commit more burglaries.  Judge Hixson stated, "[i]f I release him, he will commit more burglaries, without a doubt."  Dkt. 150 at 22.  Judge Hixson was reasonable to conclude this.  Indeed, as Judge Hixson found, there is no condition or combination of conditions that will reasonably assure the safety of the community should Jones be released.

The Court should follow Judge Hixson's ruling and deny Jones's motion to revoke pretrial detention.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the pending Motion and order Jowaun Jones remain detained pending trial.

Dated: April 16, 2026                                          Respectfully Submitted,

                                                               CRAIG H. MISSAKIAN
                                                               United States Attorney

                                                               _____*/s/ Kelly I. Volkar*_____
                                                               ALETHEA M. SARGENT
                                                               KELLY I. VOLKAR